**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 22 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT REICH, Secretary of Labor,
United States Department of Labor,

        Plaintiff-Appellee-
        Cross-Appellant,

   v.

MONFORT, INC., a Delaware
corporation,

        Defendant-Appellant-
        Cross-Appellee.

Nos. 96-1544
   &    97-1028

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 92-M-2456)

---

Daniel R. Satriana, Jr. (Alan Epstein, also of Hall & Evans, Denver, Colorado, with him
on the briefs) for Defendant-Appellant-Cross-Appellee.

Paula Wright Coleman, Attorney, U.S. Department of Labor (J. Davitt McAteer, Acting
Solicitor of Labor; Steven J. Mandel, Associate Solicitor; Tedrick A. Housh, Jr., Regional
Solicitor; Paul L. Frieden, Assistant Counsel for Appellate Litigation, U.S. Department of
Labor, Washington, D.C., with her on the briefs) for Plaintiff-Appellee-Cross-Appellant.

---

Before **ANDERSON**, **LOGAN**, and **MURPHY**, Circuit Judges.

---

**LOGAN**, Circuit Judge.

The Secretary of Labor filed this action alleging that defendant Monfort, Inc., a meat processing company, willfully violated the Fair Labor Standards Act (FLSA) by failing to compensate its employees for certain pre- and post-shift work activities. The district court found that defendant violated the FLSA, the violations were willful and thus subject to a three-year statute of limitations, and it ordered restitution and a permanent injunction. On appeal (No. 96-1544) defendant asserts that the district court erred in concluding that the de minimis exception did not apply and that defendant's violation was willful and thus subject to the three-year statute of limitations. Plaintiff cross-appeals (No. 97-1028) the district court's determination that any back pay which could not be distributed within five years due to inability to locate employees would be returned to defendant.

I

The following factual findings of the district court are not at issue in this case:

The defendant, Monfort, Inc., a subsidiary of Con Agra, owns and operates a meat packing plant in Greeley, Colorado. It is an "enterprise engaged in commerce or in the production of goods for commerce" as defined by 29 U.S.C. § 203(s)(1).

The employees at the Greeley plant involved in this case work in the slaughter and processing of beef into primal and sub-primal cuts commonly called "boxed beef." They are divided into two groups: slaughter and fabrication departments.

The plaintiff asserts that the violations at issue occurred in both departments, beginning on December 15, 1989, and continue to the present. Although some changes in the practices and work environment were made

during this period, those changes are not relevant to the liability issues presented.

The employees in both departments are paid on "gang time." Accordingly, recorded work begins when the first animal or animal part arrives at the employee's individual work station on the production line and ends when the last animal or animal part leaves that station.

Employees in both departments are required to don safety and sanitary clothing and equipment after they arrive for work and before taking their places on the production line. Separate locker rooms are provided for men and women workers. This activity is not supervised.

The clothing and equipment required varies according to particular positions and job assignments. A detailed classification of the work involves about 180 job assignments in fabrication and almost 200 job assignments in slaughter. There are multiple combinations of equipment from the following list of items: hard hat, earplugs, hairnets, cotton frocks, knives, scabbards, safety boots, arm guards, arm mesh, mesh apron, back mesh, mesh gloves, a "wizard glove," gaiters, safety glasses, weight belt, rubber gloves and a rubber apron.

There are individual differences in the practices of the employees with respect to time of arrival and time spent in preparing for work. Some workers come early and socialize with co-workers and/or eat in the cafeteria. There are individual differences in the sequence of donning their work clothing and gear.

Many employees must walk to a knife room to exchange or pick up knives and waiting in line is common.

At lunch, most of the employees take off their scabbards, their knives and their gloves. Some remove parts of their protective gear. After lunch, the employees must again put on whatever equipment they previously took off.

After the shift, the employees must take off and clean certain protective equipment, as well as clean their cutting knives. Employees often wait in line at wash stations. More wash stations have been added during the past year, shortening the time required for waiting. The employees then

proceed to their lockers to hang up the protective equipment. Finally, most of the employees deposit their frocks at laundry stations before they are free to go home.

From the period May, 1989, to May, 1993, between 1,537 and 1,717 employees worked in the slaughter and fabrication departments and performed these activities on a daily basis at the Greeley, Colorado plant. From May, 1993, to the present time, the number of employees in each department has not significantly changed. Two shifts are worked by both the slaughter and fabrication departments, the "A" shift, which begins around 6:00 a.m. and ends around 2:30 p.m. and the "B" shift, which begins at approximately 3:00 p.m. and ends at about 11:30 p.m.

All employees are provided with badges upon the commencement of their employment at Monfort. Upon arrival at the plant, the employees run their badges across a computer type scanner, which is part of the time clock system. At the end of their shift, the employees then "clock out" with their badges prior to waiting in line to clean their equipment.

Monfort's time clock system is used only to confirm attendance of the individual employees at the work site. It is not used to compute work time.

Questionnaires were sent out by the Department of Labor to 6,186 Monfort present and former employees. Responses were received from 888 employees and 1,417 questionnaires were undeliverable. Plaintiff's statistician, Dr. Lymberopoulos, based his conclusions on the answers provided in these responses, as well as on the answers provided by the deposition testimony of 35 Monfort former and current employees. Of 35 employees deposed, seven had responded to the questionnaire and the other 26 had not responded. Dr. Lymberopoulos gave his statistical opinion that 11.57 minutes were involved in the subject activities.

The plaintiff retained C. Leon Sherman to conduct time and motion studies at Monfort's Greeley plant. Sherman studied both the A and B shifts in both the slaughter and fabrication departments. Based on his studies, Sherman opined that Monfort employees spend, on average, between 8 and 11.5 minutes per day per employee on the above described activities, without counting the time spent in these activities at lunch.

- 4 -

I Appellant's App. 17-20.

The district court determined that the preliminary and postliminary activities constituted ten minutes of compensable time, rejecting defendant's argument that it should be excluded under the de minimis doctrine. The court then found that the violation was willful, and thus subject to a three-year statute of limitations. The court permanently enjoined and restrained defendant from continuing to withhold $1,570,019.34 in unpaid overtime compensation due its employees, plus pre-and postjudgment interest. The court ordered that sums which could not be paid to claimants within sixty days be deposited with the clerk of the court, and set out procedures for attempting to identify claimants. Finally the court ordered that "[l]iability of defendant to any claimant whom neither party is able to locate within five (5) years from the date of judgment shall terminate and all sums previously due such claimant, shall be returned to defendant, upon application therefor to the Clerk of the Court." Id. at 28.

II

We first consider whether the district court erred in concluding that the de minimis exemption did not apply to the pre- and postliminary activities in this case. The parties assert that the question whether the de minimis exception applies is a ruling of law, reviewable de novo. See Bobo v. United States, 136 F.3d 1465, 1468 (Fed. Cir. 1998). But see Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 689 (1946) (extent of actual work performed is factual issue, reviewable under clearly erroneous standard). We

- 5 -

need not decide whether we apply a de novo or a clearly erroneous standard of review, because under either standard we would affirm the district court's conclusion.

The parties agree that the period of time spent on preliminary and postliminary activities was compensable unless it met the de minimis exception. In Anderson the Supreme Court held that otherwise compensable preliminary and postliminary activities are not included in calculating hours worked in a week if the period of time spent on an activity is so "insubstantial and insignificant" that it ought not be included in the work week. 328 U.S. at 693. "[A] few seconds or minutes of work beyond the scheduled working hours . . . may be disregarded. Split-second absurdities are not justified . . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." Id. at 692.

The factors to consider in determining whether an activity is de minimis were set out in Lindow v. United States, 738 F.2d 1057 (9th Cir. 1984). The Lindow court first stated that "[a]n important factor in determining whether a claim is de minimis is the amount of daily time spent on the additional work. There is no precise amount of time that may be denied compensation as de minimis. No rigid rule can be applied with mathematical certainty." Id. at 1062. Defendant points out that the instant case involved ten-minute periods, and that Lindow noted that "[m]ost courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable." Id. (citing cases). But we have cited with approval cases finding that "as little as ten minutes of

working time goes beyond the level of de minimis and triggers the FLSA." See Reich v. IBP, Inc., 38 F.3d 1123, 1126 (10th Cir. 1994).

We must evaluate three factors in addition to the amount of time to determine whether otherwise compensable time is de minimis:[1] "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether 'the claimants performed the work on a regular basis.'" Reich v. New York Transit Authority, 45 F.3d 646, 652 (2d Cir. 1995) (quoting Lindow, 738 F.2d at 1062-63).

Concerning the first factor, the district court found that the employees used a variety of safety gear that took varying times to take on and off. Thus, the court concluded that the practical difficulty of supervising and recording the additional time weighs in favor of finding it noncompensable. We agree that it would be administratively difficult to record the actual time each worker engaged in these activities.

The district court found that the next factor, the aggregate amount of compensable time, weighed in favor of the employees. The district court noted that the size of the aggregate claim was very large considering the total number of employees. Defendant argues that the aggregate amount of time refers to the aggregate for each individual

---

[1] We note that while the parties in this case and the district court set out four factors from Lindow, we read Lindow as first setting out the amount of time and then evaluating whether that time is de minimis under the three factors. See Reich v. New York City Transit Authority, 45 F.3d 646, 652 (2d Cir. 1995).

employee, citing Lindow. Here, of course, the aggregate for an individual, if looked at over the period of two to three years, was significant. See Lindow, 738 F.2d at 1063 (citing cases refusing to apply the de minimis doctrine when the amounts for individuals may have been "minimal on a daily basis but, when aggregated, amounted to a substantial claim"). It is also appropriate to consider an aggregate based on the total number of workers. The Lindow court stated that "courts in other contexts have applied the de minimis rule in relation to the total sum or claim involved in the litigation." Id. at 1063 (citing cases).

Finally, the district court considered the regularity of the additional work. The preliminary and postliminary work here took about ten minutes each day and thus the district court properly determined this factor weighs in favor of plaintiff.

Although this is a close case we agree with the district court's conclusion that the work was not de minimis and hence was compensable.

III

Defendant next asserts the district court erred in finding its violation was willful. Whether an FLSA violation is willful is a mixed question of law and fact, but we believe the factual issues predominate and therefore consider the issue under a clearly erroneous standard of review. See Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1079 (1st Cir. 1995).

- 8 -

The statute of limitations for a willful violation of the FLSA is three years rather than two years.  29 U.S.C. § 255(a).  The standard for willful violations is whether the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988) (citing Trans World Airlines v. Thurston, 469 U.S. 111, 128 (1985) (holding in the ADEA context that a willful violation was one in which the defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [statute]")); see also Gilligan v. City of Emporia, 986 F.2d 410, 413 (10th Cir. 1993).

In determining that the defendant's actions were willful in this case the district court relied in part upon a finding that the defendant's managers had known about the compensability of the pre- and postliminary activities "at least since an audit in 1984 and the same issues were resolved at a sister plant . . . in July 1989."  I Appellant's App. 21.  The evidence presented at trial showed that a wage and hour investigator had conducted a limited investigation of defendant's slaughter division in 1984 and the audit disclosed violations that were the same as those cited in the present action.  As a result of the 1984 investigation defendant paid back wages to sixty-seven employees.  Further, the July 1989 incident at a sister plant resulted in a payment of back wages to 1,752 employees and an agreement to comply with the FLSA in the future.  Supp. App. for Sec. of Labor 33.

Defendant asserts that its failure to pay workers for the compensable time was based on its position that the de minimis doctrine applied and therefore it could not be

charged with willfulness.  Defendant also argues that its settlement of other claims of a similar nature does not support a conclusion that the violations were willful because they were not litigated.  However, in Dole v. Elliott Travel and Tours, Inc., 942 F.2d 962 (6th Cir. 1991), the court held that a violation was willful because an employer had actual notice of the FLSA requirements "by virtue of earlier violations, [the] agreement to pay unpaid overtime wages, and [the] assurance of future compliance with the FLSA."  Id. at 967.  We do not read Dole or other case law to require that violations be established through litigation in order to establish that later violations were willful.  The district court's determination that defendant's conduct met the standard for a willful violation was not clearly erroneous.

IV

Finally, we address the Secretary's cross-appeal of the district court's order that back pay not distributed within five years be returned to defendant.

Under §17 of the FLSA, 29 U.S.C. § 217, once there is a finding that past wages are due the district court's discretion "to refuse the Secretary's request for a restitutionary injunction is limited, and must be tempered by considering whether the prerequisites for this remedy have been met and the policy reasons underlying Congress' enactment of the legislation have been fulfilled."  See Reich v. IBP, Inc., 38 F.3d 1123, 1126-27 (10th Cir. 1994) (quoting Donovan v. Sabine Irrigation Co., 695 F.2d 190, 197 (5th Cir. 1983)).

- 10 -

The purposes of § 17 include to make employees whole by compensating them for their losses, "to correct a continuing offense against a public interest" by both taking away the gains from the violator and by protecting employers from having to compete with those who fail to comply with the FLSA. Donovan v. Brown Equip. and Service Tools, Inc., 666 F.2d 148, 156-57 (5th Cir. 1982) (further quotations omitted); see also Usery v. Fisher, 565 F.2d 137, 139 (10th Cir. 1977) (payment of back wages rectifies an employer's debt to an employee and also effects a public interest of preventing a continuing offense of withholding wages due).

We agree with the Secretary that in view of the restitutionary injunction's goals the employer in this case should not be enriched by retaining the money that should have been paid as wages. See Marshall v. Quik-Trip Corp., 672 F.2d 801, 807 (10th Cir. 1982) ("The policies of the act would be nullified if the employer were permitted to retain sums which were refused or went unclaimed."). In Quik-Trip, we reversed the ruling of a district court and noted that courts may "prevent the nullification of the policies of the [FLSA] by providing that such sums be paid to the clerk of the district court for deposit

with the Treasurer of the United States, to be held on behalf of the employees."[2] Id. at 807.

In sum, allowing defendant here to retain back wages which are not distributed after the period of five years would allow it to benefit from its wage law violations and that would defeat the intent of the restitutionary injunction. Further, although under "exceptional circumstances" a court will allow unclaimed back wages to revert to the employer, we have found only one such reported case. In Marshall v. Edward J. Mare Memorial Hospital, 99 Lab. Cases (CCH) ¶ 34,455 (W.D.N.Y. 1983), the court allowed unclaimed moneys to revert to a public hospital. The court found that the FLSA's purpose of protecting competing enterprises was inapplicable because the hospital was not in competition with private enterprise and the back wage amounts would have to be raised by a special bond issue and eventually paid by taxpayers. The violations were not

---

[2] Section 16(c) of the FLSA provides the Secretary of Labor with authority to bring suits on behalf of employees to collect back wages and specifically provides that "[a]ny such sums not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States as miscellaneous receipts." 29 U.S.C. § 216(c). Courts have held that this statute prevents a court from returning to an employer back pay that cannot be distributed. See, e.g., United States Department of Labor v. Shennandoah Baptist Church, 707 F. Supp. 1450, 1464 (W.D. Va. 1989), aff'd, 899 F.2d 1389 (4th Cir.), cert. denied, 498 U.S. 846 (1990). The suit in the instant case, however, was brought under § 17 of the FLSA, which does not provide a comparable escheat provision. See, e.g., Marshall v. Quik-Trip Corp., 672 F.2d 801, 809 n.9 (10th Cir. 1982) ("[u]nlike unclaimed funds awarded under § 16(c) of the FLSA, which escheat to the United States by statute . . . , payments ordered under § 17 never permanently escheat to the United States").

willful and the hospital undertook to reduce the unclaimed amount by paying deceased claimants' estates.

The instant case is very different from <u>Marshall</u> and does not present exceptional circumstances. We therefore must reverse the district court's order that the defendant would be allowed to petition for the return of undistributed moneys unclaimed after a five-year period.

AFFIRMED IN PART, REVERSED IN PART.