616 S.E.2d 722

**Ernest MILLER and Patricia Miller, Appellants,**

v.

**BLUMENTHAL MILLS, INC., Respondent.**

**No. 4013.**

Court of Appeals of South Carolina.

Heard June 15, 2005.

Decided July 5, 2005.

206

208

Chalmers C. Johnson, of Charleston, for appellants.

Michael S. Thwaites, of Greer, for respondent.

ANDERSON, J.:

This appeal arises from the trial court's grant of summary judgment to the employer in a case brought by employees pursuant to the Fair Labor Standards Act for unpaid overtime

wages. We affirm in result as to Ernest Miller. We reverse and remand as to Patricia Miller.

## FACTUAL/PROCEDURAL BACKGROUND

Blumenthal Mills, Inc., is a textile manufacturer located in Marion, South Carolina. Patricia Miller (Patricia) is employed by Blumenthal. Ernest Miller (Ernest), Patricia's husband, worked for Blumenthal before being terminated in May 2003 after a confrontation with a Blumenthal supervisor. The Millers filed suit against Blumenthal alleging an unwritten plant rule required its workers to clock in approximately twenty minutes early every day to "perform ... machine preparation" or look over their work. The Millers aver that during training, they were instructed to come in about twenty minutes before their shift started to check and make sure the prior shift left them in good shape. The Millers were not paid for this extra time. They contend the failure to pay overtime violates the Fair Labor Standards Act (FLSA).[1]

Blumenthal has a written policy contained in an employee handbook permitting its employees to clock in "a reasonable amount of time before the commencement of their shift." Blumenthal asserts "[t]his guideline is designed as a convenience to [employees] and to ease congestion at the time clock during starting and quitting times." This policy prohibits employees from beginning any work-related activity before their regularly scheduled starting time, unless such activity is first approved in writing by management.

In order to provide a degree of exactitude in regard to the testimony of Patricia, we quote her deposition extensively:

Q. It has down here, "Today had a meeting with Tim Richardson. . . . Tim also said I was doing a good job coming in early and checking my cloth. Julia was in there with me." Where was this meeting?

A. In the supervisor's office.

Q. Who is Julia?

A. She is another weaver. Julia Davis.

. . . .

---

1. 29 U.S.C. §§ 201–219 (1998 & Supp.2005).

Q. When you went to work for Blumenthal, initially, was it as a weaver?

A. No, sir. I was a creeler.

. . . .

Q. Now, the creelers, are they required to be there twenty minutes ahead of time?

A. They have been told to get in there and check their job early to make sure everything was right.

Q. OK. . . . [W]ere you told to do that when you first went to work there?

A. Yes.

Q. How long did it take you to do that?

A. At l[e]ast fifteen, twenty, twenty-five minutes.

Q. What would you have to do?

A. Go down the set I was creeling and check to see if all the filling was on the creel stand and make sure that I wasn't being left bad.

Q. You mean by the other shift when you say left bad?

A. Yes.

Q. Why couldn't you do that when your shift started as opposed to twenty minutes before?

A. Because if I was left bad, there was nothing I could do about it.

Q. All right. But, if you were left bad, what could you do about it then if you observed it before the shift?

A. I can have the other creeler took into the office and had said something about it to see if she couldn't tighten up in doing her job a little bit better.

. . . .

Q. But . . . basically what you had to do is come in early to check on what the creelers were doing before you?

A. Yes.

. . . .

Q. How did you find out that you as a creeler were expected to be there early to check your work?

A. From the creeler that was training me.

Q. Who was that?

A. Sylvia.

. . . .

Q. What exactly did Sylvia say to you?

A. She would say "Come in early. Check your job and make sure it is right. If it is not, then you can take care of it."

Q. Would she tell you how early to come in?

A. She would say at least twenty minutes ahead of time.

. . . .

Q. Did you [later] go through a specific training course [to become a weaver]?

A. Yes.

Q. Who conducted that?

A. Ms. Diane.

. . . .

Q. OK. Tell me about your weaver training. What did that involve?

A. . . . Ms. Diane would say "You come—need to come—be on your job at least twenty minutes ahead of time."

. . . .

Q. . . . [Y]our testimony is that Diane told the entire weave class they had to come in twenty minutes early?

A. Yes.

Q. And, did she tell you why?

A. To make sure our jobs were running good.

Q. Did she tell you what that involved . . . making sure your jobs ran good?

A. Yes. That was . . . to check your cloth. Walk the back of your looms to make sure none of your lenos was running out.

. . . .

Q. . . . Check the cloth on your looms to make sure there were no defects?

A. No defects.

. . . .

Q. Well, why would you need to come in early to do that?

A. To make sure it is running no defects. If it is running defects, I can stop it off.

. . . .

Q. OK. So, you check cloth for defect. What else would you do?

A. Check the back of the looms to make sure we had no lenos running out.

. . . .

Q. So, you would go in early to check and make sure that you had ten [lenos on one side] and eight [lenos on the other side]?

A. Yes. If not, we can stop off the loom and have that weaver to put them lenos in.

. . . .

Q. Well, did you say that . . . you would go before your shift started and check this?

A. Yes.

Q. And, did you then have the ability to stop the loom?

A. Yes.

Q. So, you would stop the loom on somebody else's shift?

A. Yes. That is exactly what they told us we are allowed to do.

Q. Did you ever actually do that?

A. Yes.

. . . .

Q. OK. And, would you then prior to your shift starting have to physically go to each of the fifteen looms and check for quality?

A. Yes.

Q. How long would that take?

A. It usually takes no more than about twenty, twenty-five minutes.

. . . .

Q. OK. How long would it take you to check [the lenos]?

A. It is probably no more than about a minute.

Q. Well, what if you found that there weren't enough lenos? There was some problem with it. Would you then have to—

A. Stop the loom off and . . . put the right amount of lenos in.

Q. How often did that happen or does that happen?

A. It happens every day.

. . . .

Q. And, you do this before your shift starts?

A. Yes.

Q. How long does it take you in an average day—how many lenos do you have to swap out?

A. Anywhere from two to three.

Q. How long does it take you to do that?

A. It takes a good three minutes to run one—one leno in.

Q. So, that could take in an average day ten minutes?

A. Yes, sir.

Q. OK. So, we have got checking cloth and making sure about the lenos. Anything else that you have to do?

A. Yes. We have to make sure it is running the right filling.

Q. How do you do that?

A. The weave order, we go and look to see what color the filling is that is supposed to be on the loom, then we take the weave order and match it up with the filling that is on the creel stand.

. . . .

Q. OK. And, then you look at the weave order and you do what with it?

A. Take it and go around to the filling to make sure it is running the right filling.

Q. OK. And, you do that for each of your fifteen looms?

A. Yes.

Q. How long would that take total time?

A. No more than about two or three minutes [per loom].

. . . .

Q. . . . So, we are still talking about before your shift starts. We have got checking cloth for defects. Dealing with the lenos. And, then I forgot what you called this last thing. Matching up the orders to the filler?

A. Yes. To the filling.

. . . .

Q. . . . [W]hen you had a bunch of [lenos] you had to swap out, how long could that take to do?

A. Well, if you couldn't get them before work, then it would take all day to put them in. . . .

. . . .

Q. . . . When you are matching up the orders to the filling and you find there's mismatches, what would you have to do then?

A. Stop the loom off and take the wrong filling off and make—get the right filling and put it on there.

Q. Now, would you . . . also do that before your shift would start?

A. Yes.

Q. So, you would stop another weaver's loom?

A. Yes.

. . . .

Q. OK. Well, does that mean that you would . . . come to work, go out and do the prep work, and then go back to the time clock and clock in?

A. No, sir. I would clock in, then I would go to work.

. . . .

Q. . . . And this coming in early has been the rule the whole time, is that right?

A. Yes.

. . . .

Q. I mean, were you aware you weren't getting paid for this time?

·A. Yes, sir.

. . . .

Q. But, even with these written guidelines in place, it is your testimony that the real rule is that you do have to come in twenty minutes ahead of time and do prep work?

A. Yes, because they tell us to.

Q. Who is they?

A. Trainees, our supervisor. If we are having a problem with the weaver that—that is leaving us and they will say if we don't want our job running bad to come in and check it out a little bit early.

. . . .

Q. . . . . I want you to give me the—a list of the names of any witness, any person who can provide first hand testimony that is can say that they have seen you perform work-related activity before your shift started?

A. OK. Julia Davis.

Q. Let me write them down as we are going along. Julia Davis. She still works there?

A. Yes. Jackie. I don't know Jackie's last name.

Q. What does Jackie do?

A. She's a weaver.

Q. On what shift?

A. My shift. Woody Church. Was Roger Hilderbrand, but he ain't there no more.

Q. All right. Woody Church is your immediate supervisor?

A. Yes. And, he knows every morning when I clock in and when I go to my job, right along with Roger Hilderbrand, because I will be checking my cloth when Roger be doing his job and Roger will walk right by me.

Q. OK.

A. Tim Richardson, whenever Woody was out, he would come by and tap me on the shoulder and say, "Good job," and keep right on getting it. Deborah, James Wallace.

Q. All right. What's Deborah's last name?

A. I do not know Deborah's last name.

Q. She work there still?

A. Yes.

Q. Is she a weaver?

A. Yes.

Q. On your shift?

A. Yes.

Q. OK. I'm sorry. The next person.

A. James Wallace, Tim Martin.

Q. James Wallace is a weaver?

A. Well, he's a smash hand now.

Q. Right. And Tim?

A. Martin.

Q. Who is he?

A. He is a pattern-change man. He is the—what is the next one in command? I can't—I can't remember what they call him. But, he is next in command. If Woody is out, he is supposed to take over Woody's place.

Q. Was he like a lead man or something?

A. Something like that.

Q. OK. Anybody else?

A. The creelers. Tanya. The doffers, which I do not know their names.

. . . .

Q. . . . But, Julia Davis, again, who was she?

A. She's a weaver.

Q. And, she works the same shift you do?

A. The same shift I do.

Q. All right. What is it exactly that she can testify about? What could she say?

A. That I come in early and do my job. Start my job.

Q. Is that what they can all say? I mean—

A. Yes.

Q. So, Woody Church, your supervisor could say that—that he has seen you come in early and actually perform work-related activity twenty minutes before your shift started?

A. Yes.

Patricia listed nine employees who saw her "pre-shift" work, including her two supervisors. In his deposition, Woody Church, one of Patricia's supervisors, declared he could not confirm or deny any pre-shift work because he would not have been in those work areas during the times around the shift changes. According to Ernest, at a team meeting, a fellow

employee complained: "Why in the hell do we have to come in here early if we don't get paid for it?" Kenneth Gunnin, the mill president, told him: "If you don't want your damn job, don't let the door hit you."

Blumenthal moved for summary judgment, which the trial court granted.

## STANDARD OF REVIEW

 When reviewing the grant of a summary judgment motion, the appellate court applies the same standard which governs the trial court under Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Pittman v. Grand Strand Entm't, Inc.,* 363 S.C. 531, 611 S.E.2d 922 (2005); *B & B Liquors, Inc. v. O'Neil,* 361 S.C. 267, 603 S.E.2d 629 (Ct.App.2004). In determining whether any triable issue of fact exists, the evidence and all inferences which can reasonably be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Medical Univ. of South Carolina v. Arnaud,* 360 S.C. 615, 602 S.E.2d 747 (2004); *Rife v. Hitachi Constr. Mach. Co., Ltd.,* 363 S.C. 209, 609 S.E.2d 565 (Ct.App.2005). If triable issues exist, those issues must go to the jury. *Mulherin–Howell v. Cobb,* 362 S.C. 588, 608 S.E.2d 587 (Ct.App.2005).

 Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Helms Realty, Inc. v. Gibson–Wall Co.,* 363 S.C. 334, 611 S.E.2d 485 (2005); *BPS, Inc. v. Worthy,* 362 S.C. 319, 608 S.E.2d 155 (Ct.App.2005). On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below. *Willis v. Wu,* 362 S.C. 146, 607 S.E.2d 63 (2004); *see also Schmidt v. Courtney,* 357 S.C. 310, 592 S.E.2d 326 (Ct.App.2003) (stating that all ambiguities, conclusions, and inferences arising from the evidence must be construed most strongly against the moving party).

██ Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Gadson v. Hembree*, 364 S.C. 316, 613 S.E.2d 533 (2005); *Montgomery v. CSX Transp., Inc.*, 362 S.C. 529, 608 S.E.2d 440 (Ct.App.2004). Even when there is no dispute as to evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Nelson v. Charleston County Parks & Recreation Comm'n*, 362 S.C. 1, 605 S.E.2d 744 (Ct.App.2004). However, when plain, palpable, and indisputable facts exist on which reasonable minds cannot differ, summary judgment should be granted. *Ellis v. Davidson*, 358 S.C. 509, 595 S.E.2d 817 (Ct.App.2004).

██ The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact. *McCall v. State Farm Mut. Auto. Ins. Co.*, 359 S.C. 372, 597 S.E.2d 181 (Ct.App.2004). Once the party moving for summary judgment meets the initial burden of showing an absence of evidentiary support for the opponent's case, the opponent cannot simply rest on mere allegations or denials contained in the pleadings. *Regions Bank v. Schmauch*, 354 S.C. 648, 582 S.E.2d 432 (Ct.App.2003). Rather, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. *Rife*, 363 S.C. at 214, 609 S.E.2d at 568.

██ The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder. *Dawkins v. Fields*, 354 S.C. 58, 580 S.E.2d 433 (2003); *Rumpf v. Massachusetts Mut. Life Ins. Co.*, 357 S.C. 386, 593 S.E.2d 183 (Ct.App.2004). Because it is a drastic remedy, summary judgment should be cautiously invoked to ensure that a litigant is not improperly deprived of a trial on disputed factual issues. *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 594 S.E.2d 455 (2004); *Hawkins v. City of Greenville*, 358 S.C. 280, 594 S.E.2d 557 (Ct.App.2004).

### *LAW/ANALYSIS*

The Millers argue the trial court incorrectly held they must provide competent, corroborative evidence to support their allegations that they worked overtime and that management

had either actual or constructive knowledge of the overtime hours worked.

## I. Fair Labor Standards Act

 "The main federal law regulating wages and hours of employment is the Fair Labor Standards Act [of 1938]." 48A Am.Jur.2d *Labor and Labor Relations* § 3808 (1994). The purpose of the FLSA is to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). The FLSA was enacted in response to a congressional finding that some industries, engaged in commerce, maintained labor conditions which were detrimental to a minimum standard of living necessary for health, efficiency, and the general well-being of workers. *See* 29 U.S.C. § 202(a) (1998). The Act attempts to eliminate unfair labor practices without substantially curtailing employment or earning power. 29 U.S.C. § 202(b). Because the FLSA is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals. *Tennessee Coal, Iron & R.R. Co.,* 321 U.S. at 597, 64 S.Ct. 698; *Benshoff v. City of Virginia Beach,* 180 F.3d 136 (4th Cir. 1999).

The FLSA's overtime provision, contained in Section 207(a)(1), reads in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1) (1998). Section 216(b) of the FLSA gives employees a cause of action against employers who have violated § 207(a)(1) and allows them to recoup the overtime wages plus liquidated damages, attorney's fees, and costs. 29 U.S.C. § 216(b) (1998).

 In order to recover for a violation of section 207(a)(1), an employee must prove (1) he worked overtime hours without compensation; (2) the amount and extent of the overtime work

as a matter of just and reasonable inference; and (3) the employer had actual or constructive knowledge of the overtime work. *Davis v. Food Lion, Inc.*, 792 F.2d 1274 (4th Cir.1986). When employer knowledge is at issue, it has consistently been held that the employee has the initial burden of proving that the employer knew or should have known of the overtime work. *See Davis*, 792 F.2d at 1276; *see also Pforr v. Food Lion, Inc.*, 851 F.2d 106 (4th Cir.1988) (noting the burden is on the plaintiff to establish knowledge, either actual or constructive, that the employer suffered or permitted the performance of uncompensated overtime work). "The case law uniformly supports this proposition." *Davis*, 792 F.2d at 1276.

The circuit court based its decision to grant Blumenthal's motion for summary judgment on the following conclusion: "At summary judgment, Plaintiffs may not rest on unsupported allegations that they worked overtime and that management knew it; rather, plaintiffs must provide competent, corroborative evidence to support each of these elements." This fatal determination is premised singularly on two decisions: *Darrikhuma v. Southland Corp.*, 975 F.Supp. 778, 783–84 (D.Md.1997), *aff'd*, 129 F.3d 1258 (4th Cir.1997) (unpublished), and *Doran v. Sigman*, 1998 U.S. Dist. Lexis 6219 (W.D.Va.1998). Importantly, a careful search of FLSA case law demonstrates no court has required this increased burden of proof from the plaintiff.

The case of *Lyle v. Food Lion, Inc.*, 954 F.2d 984 (4th Cir.1992), is indicative of a standard FLSA claim. The *Lyle* court inculcated: "To prevail in the district court, [the employees] had to prove by a preponderance of the evidence that they worked overtime hours without compensation and that Food Lion knew of such work." *Id.* at 987. In *Lyle*, Food Lion appealed a decision holding it violated the FLSA on the basis that the evidence was insufficient to prove overtime hours were either worked or that Food Lion knew of the work. *Id.* The Fourth Circuit quoted and agreed with the district court's finding:

This case hinges on a credibility determination. The plaintiffs testified that they regularly worked off-the-clock with the knowledge of Food Lion officials at the store level. These officials testified that they had no such knowledge

and that it would have been impossible for the plaintiffs to have worked off-the-clock without their knowledge. The court believes the plaintiffs and not the store managers. *Id.* Nowhere in the *Lyle* case does the court of appeals find that (1) employees cannot rest on unsupported allegations that they worked overtime and the management knew it and (2) employees must provide competent, corroborative evidence.

Although the circuit court relied on *Darrikhuma*, that case is distinguishable from the case *sub judice.* *Darrikhuma* applies to a set of facts that are inapposite to the facts of the instant case. *Darrikhuma* is dissimilar from this case and many other FLSA cases because Darrikhuma took steps to hide his off-the-clock work from his employer. Darrikhuma's alleged unauthorized use of overtime was documented by his supervisor and he was informed that any unauthorized overtime would result in disciplinary action or termination. Darrikhuma had previously requested overtime but was refused and told if he needed overtime he would be replaced. 975 F.Supp. at 783. Darrikhuma then started working overtime hours in order to complete his duties but did not report them on his time sheet. *Id.* Darrikhuma's time sheet contained a statement from the employer warning employees not to work off-the-clock. *Id.* at 780.

Darrikhuma tried to impute constructive knowledge of his employment to his employer by stating a field consultant, who was not Darrikhuma's manager, knew about his working off-the-clock hours. *Id.* at 783. However, the field consultant thought Darrikhuma was a salaried employee and thus not subject to overtime restrictions. After declaring this was not enough to justify the claim, the district court explicated: "Additionally, Plaintiff offers no more than his own unsupported allegations that Defendant was actually advised of his working on the job and not being paid for those hours. Thus, Plaintiff has failed to establish that Defendant had constructive or actual knowledge." *Id.* at 784. The district court's order, which involved numerous other issues, was affirmed by the Fourth Circuit Court of Appeals in an unpublished decision that did not address any of the issues but simply affirmed the district court's opinion. *See Darrikhuma v. Southland Corp.,* 129 F.3d 1258 (4th Cir.1997).

The present case shares none of the factual similarities of *Darrikhuma*. The Millers did not intentionally hide their off-the-clock hours. In fact, a review of their time sheets demonstrates the Millers clocked in early. Unlike Darrikhuma, Patricia testified she had been trained and instructed by Blumenthal to engage in this pre-shift activity. Patricia specifically named the trainers, supervisors, and other members of management who had directed her to perform this pre-shift work. Patricia indicated there were a number of employees who heard the trainers, supervisors, and members of management when they instructed her in this regard. Unlike Darrikhuma, who performed his overtime hours on the weekend when management was not on site, Patricia performed her work during working hours and during a time when management was present at the mill. In contrast to Darrikhuma, who was threatened with termination if he worked the extra hours, Patricia testified that, when she was working uncompensated, pre-shift hours, one of her supervisors "would come by and tap [her] on the shoulder and say, 'Good job,' and keep right on getting it."

The Millers' case bears a striking resemblance to the Fourth Circuit's decision in *Lyle*. In *Lyle*, the employer had a policy preventing off-the-clock work. 954 F.2d at 986. Blumenthal had a putative policy preventing pre-shift work. In *Lyle*, the employees' case rested solely on their statement they worked overtime and management knew it. Similarly, Patricia alleged she worked overtime and management knew it. In addition, Patricia submitted an affidavit from John Schaeffer, a former co-worker, who stated in relevant part:

2. While I worked at Blumenthal Mills, Inc., I was told to come in about 20 to 30 minutes before my shift to begin work.

3. I regularly did this, and understood that it was a requirement.

4. Other employees also regularly came in before their shifts to work.

5. The work we did was the same kind of work that we performed while on our regular shifts.

6. Management of Blumenthal Mills, Inc. was aware that we were being told to come in and work before our shifts. They enforced this as a rule.

7. We did not get paid for the time we worked before our shifts.

*Lyle* was not as strong as Patricia's case because the managers in *Lyle* affirmatively testified that the employees did not work off-the clock. Patricia's manager testified he would not have known if Patricia came to work earlier than her shift. Patricia explained her decision to keep quiet: "I seen [sic] a lot of people lose their job out there for no reason at all, because they complained about certain things out there."

Moreover, *Darrikhuma* is not the pronouncement of a new rule but is limited to the facts of that case. In fact, under "Summary Judgment Standard," the court articulates established summary judgment principles, *NOT* an increased burden for the plaintiff:

## II. SUMMARY JUDGMENT STANDARD

Summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The movant must demonstrate that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). While the Court views the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment, *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the mere existence of a "scintilla of evidence" is not enough to frustrate the motion. To defeat it, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

*Id.* at 783. The ruling in *Darrikhuma* does not allow a court to ignore a plaintiff's testimony as evidence in an FLSA case concerning overtime claims.

*Darrikhuma* does not hold that a plaintiff must present more than his own testimony to support a claim for unpaid overtime under the FLSA. Instead, the court explained that Darrikhuma failed to produce any evidence beyond his own speculation to prove that a third party who saw him working on weekends (1) knew that Darrikhuma was an hourly worker; (2) knew that, when she saw Darrikhuma working on weekends, he was working overtime hours, not part of his usual schedule; and (3) actually told Darrikhuma's management that she had seen Darrikhuma working on the weekends. When presented with the question of whether he could prove the employer's management knew or should have known about his overtime work, Darrikhuma could only produce his speculation that the third party may have told management. Both the third party and management denied this. Unlike Darrikhuma, Patricia presented more than mere speculation about whether Blumenthal knew or should have known about the overtime hours for which she was not being compensated.

According to the controlling case law, an employee in a section 207(a)(1) case must prove the employer knew or should have known about his overtime work and need only show facts from which a reasonable inference can be drawn as to the amount of overtime he worked without compensation. There is no heightened burden of proof beyond that in other civil cases. An employee plaintiff's own testimony in a section 207(a)(1) case is evidence from which a reasonable juror could find the plaintiff worked the overtime hours he alleged and that management was aware of the uncompensated overtime hours worked. There is no requirement that the employee do more than testify himself as to the elements.

Significantly, in *Higgins v. Food Lion, Inc.*, 197 F.Supp.2d 364 (D.Md.2002), the district court cited *Darrikhuma* for the following principle: "Additionally, a plaintiff must show that the employer had actual or constructive notice of the fact that the uncompensated person was working without compensation." *Id.* at 368. *Higgins* did *NOT* include a requirement that a plaintiff must present more than his own unsupported allegations that employer was actually advised of his working on the job and not being paid for those hours.

## II. Portal–to–Portal Act

In 1947, Congress enacted the Portal–to–Portal Act to clarify the duties of employers regarding the compensation of employees for activities that constitute work but which occur before, after, or during the work shift. *Gonzalez v. Farmington Foods, Inc.*, 296 F.Supp.2d 912 (N.D.Ill.2003). The Portal–to–Portal Act provides in pertinent part:

(a) Activities not compensable

[N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, ... on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee ...

. . . .

(2) activities which are preliminary or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(2) (1998).

The Portal–to–Portal Act established two categories of activities: (1) those which are principal and (2) those which are preliminary or postliminary. *Gonzalez*, 296 F.Supp.2d at 924. Thus, even when an activity is properly classified as "work," the Portal–to–Portal Act exempts from compensation activities which are preliminary or postliminary to an employee's principal activity or activities. In *Steiner v. Mitchell*, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956), the United States Supreme Court established an exception to this rule:

[A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1) [of the Portal–to–Portal Act].

*Id.* at 256, 76 S.Ct. 330; *see also Davis v. Charoen Pokphand (USA), Inc.,* 302 F.Supp.2d 1314 (M.D.Ala.2004) (noting that activities are within coverage of FLSA, and outside exception in Portal–to–Portal Act, if those activities are integral and indispensable part of principal activities for which covered workmen are employed). "An activity is integral to a principal activity if the activity is made necessary by the nature of the work performed, it fulfills mutual obligations between the employer and his employees, the activity directly benefits the employer in the operation of his business, and the activity is closely related to other duties performed by the employees." *Hiner v. Penn–Harris–Madison Sch. Corp.,* 256 F.Supp.2d 854, 859 (N.D.Ind.2003).

■■■ "As the Department of Labor stated in an interpretive bulletin, 'Congress intended the words principal activities to be construed liberally . . .' to include any work of consequence performed for an employer, no matter when the work is performed." *Lindow v. United States,* 738 F.2d 1057, 1061 (9th Cir.1984) (quoting 29 C.F.R. § 790.8(a)). In order for a particular activity to be "integral and indispensable," it must be necessary to the principal activity performed and done for the benefit of the employer. *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 750 F.2d 47 (8th Cir.1984); *Lee v. Am–Pro Protective Agency, Inc.,* 860 F.Supp. 325 (E.D.Va.1994).

■■■ Activities spent predominantly in the employees' own interests are preliminary or postliminary. *Dunlop v. City Elec., Inc.,* 527 F.2d 394 (5th Cir.1976); *Truslow v. Spotsylvania County Sheriff,* 783 F.Supp. 274 (E.D.Va.1992). However, an activity is not deemed "preliminary or postliminary" and excluded from FLSA merely because it takes place before or after the work shift. *See Mitchell v. King Packing Co.,* 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956); *Lee,* 860 F.Supp. at 327. In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), the Supreme Court discussed pre-shift duties and found the ones alleged were compensable. The Court illuminated:

The employees proved, in addition, that they pursued certain preliminary activities after arriving at their places of work, such as putting on aprons and overalls, removing shirts, taping or greasing arms, putting on finger cots,

preparing the equipment for productive work, turning on switches for lights and machinery, opening windows and assembling and sharpening tools. These activities are clearly work falling within the definition enunciated and applied in the Tennessee Coal and Jewell Ridge cases. They involve exertion of a physical nature, controlled or required by the employer and pursued necessarily and primarily for the employer's benefit. They are performed solely on the employer's premises and are a necessary prerequisite to productive work. There is nothing in such activities that partakes only of the personal convenience or needs of the employees. Hence they constitute work that must be accorded appropriate compensation under the statute.

*Id.* at 692–93, 66 S.Ct. 1187.

 "Decisions construing the Portal–to–Portal Act in conjunction with the FLSA make clear that the excepting language of section 4 was intended to exclude from FLSA coverage only those activities predominantly . . . spent in the employees' own interests." *Dunlop*, 527 F.2d at 398 (internal quotations omitted). No benefit may inure to the company. *Id.* The Portal–to–Portal Act excluded from FLSA coverage activities undertaken for the employees' own convenience, not required by the employer and not necessary for the performance of the employee's duties. *Id.* The exemption was not intended to relieve employers from liability for any work of consequence performed for an employer from which the company derives significant benefit. *Id.* at 398–99. Necessity to the principal activity and benefit to the employer are the two critical tests. *Lee*, 860 F.Supp. at 327. The *Lindow* court noted it had not found any authority "which suggests that an employee's labor is not integral and indispensable if it could have been performed during regular hours. As long as the work is 'suffered' or 'permitted' outside of normal hours, the work is compensable." *Lindow*, 738 F.2d at 1061. The Portal–to–Portal Act exception is to be construed narrowly. *Dunlop*, 527 F.2d at 398–99.

 Blumenthal allows an early clock-in in part to ease congestion at the time clock during shift changes. This transition is made for the benefit of the mill so the mill can have seamless and continuous production. Additionally, there

is evidence of an unwritten rule requiring the workers to arrive early. Patricia alleges she was trained to be at work approximately twenty minutes early. Patricia's testimony showed the purpose of her early arrival is to prevent defects and, if there is a problem or defect, she can stop the machine and correct it during her pre-shift time. While a disciplinary policy was not in place to discipline employees that did not arrive early, an effective policy existed because the employees could be written up if they did not reach a pre-set quota of completed work at the conclusion of their shift.

The work Patricia asseverates she was required to perform prior to the beginning of her shift is not similar to the examples found in other Portal–to–Portal Act cases. For instance, in *Lindow v. United States*, the district court found that prior to the start of their shifts the employees socialized and engaged in other non-work related activities. *Lindow*, 738 F.2d at 1059.

There is evidence in the record from which a reasonable jury could find that the work in which Patricia engaged, prior to the start of her shift, was actually the same work she did while on shift, rather than minor preparatory work.

### III. De Minimis Rule

Under the FLSA, employees cannot recover for otherwise compensable time if it is de minimis. *Lindow v. United States*, 738 F.2d 1057 (9th Cir.1984). The de minimis rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes. *Id.* Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes. *Id.*

The Supreme Court, in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 693, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), held that activities which involve "insubstantial and insignificant" periods of time are de minimis and should "not be included in the statutory workweek." The *Anderson* Court concluded:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such

trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved. *Id.* at 692.

■■■■■■ One factor in determining whether a claim is de minimis is the amount of daily time spent on the additional work. *Lindow,* 738 F.2d at 1062; *see also Gonzalez v. Farmington Foods, Inc.,* 296 F.Supp.2d 912, 928 (N.D.Ill.2003) ("In *Lindow,* the court set out four factors for determining whether an activity is de minimis as a matter of law."). There is no precise amount of time that may be denied compensation as de minimis. *Lindow,* 738 F.2d at 1062. No rigid rule can be applied with mathematical certainty. *Id.; Frank v. Wilson & Co.,* 172 F.2d 712 (7th Cir.1949). Rather, common sense must be applied to the facts of each case. *Lindow,* 738 F.2d at 1062.

Most courts have found daily periods of approximately ten minutes de minimis even though otherwise compensable. *See, e.g., E.I. du Pont De Nemours & Co. v. Harrup,* 227 F.2d 133 (4th Cir.1955) (ten minutes); *Green v. Planters Nut & Chocolate Co.,* 177 F.2d 187, 188 (4th Cir.1949) ("obvious" that ten minutes is de minimis); *Lindow v. United States,* 738 F.2d 1057 (9th Cir.1984) (seven to eight minutes); *Carter v. Panama Canal Co.,* 314 F.Supp. 386 (D.D.C.1970) (two to fifteen minutes), *aff'd,* 463 F.2d 1289 (D.C.Cir.1972). However, the Ninth Circuit Court of Appeals, in *Ballaris v. Wacker Siltronic Corp.,* 370 F.3d 901 (9th Cir.2004), recently found twenty to thirty minutes was *NOT* de minimis. *Id.* at 912; *see also Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706 (2d Cir.2001) (fifteen minutes is not de minimis); *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407 (5th Cir.1990) (fifteen minutes not de minimis); *Reich v. Monfort, Inc.,* 144 F.3d 1329, 1333 (10th Cir.1998) ("[W]e have cited with approval cases finding that 'as little as ten minutes of working time goes beyond the level of de minimis and triggers the FLSA.' "); *Metzler v. IBP, Inc.,* 127 F.3d 959 (10th Cir.1997) (fourteen minutes is not de minimis). Case law suggests it would be inappropriate to find that approximately twenty minutes of daily time spent on the additional work constitutes a de minimis amount of time.

The second factor that must be considered in determining whether otherwise compensable time is de minimis is "the practical administrative difficulty of recording the additional time." *Lindow*, 738 F.2d at 1063. "Employers ... must compensate employees for even small amounts of daily time unless that time is so minuscule that it cannot, as an administrative matter, be recorded for payroll purposes." *Id.* at 1062–63.

The third factor that must be considered is the size of the aggregate claim. *Id.* at 1063. Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim. *Id.* The fourth factor that must be considered in applying the de minimis rule is whether the employee performed the work on a regular basis. *Id.; see also* 29 C.F.R. § 785.47 (noting that employer should compensate "fixed or regular" working time, however small).

"To summarize, in determining whether otherwise compensable time is de minimis, we will consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow*, 738 F.2d at 1063.

Applying the *Lindow* factors to the case at bar, jury issues are presented as to whether: (1) the time is easily recorded on the actual time cards of Patricia; (2) twenty minutes, factored in the aggregate, is a de minimis amount of time; and (3) the work is performed regularly and is not a sporadic requirement.

## IV. FLSA Designed to Protect Employees

The FLSA was designed to protect employees. In *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), the Supreme Court articulated:

The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and

employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided.

*Id.* at 706–07, 65 S.Ct. 895 (footnotes omitted). *Doe v. United States,* 372 F.3d 1347 (Fed.Cir.2004), clarifies that employers cannot escape liability if they permit or suffer an employee to work overtime. *Id.* at 1360–61; *see also* 29 C.F.R. 185.11 (noting that work not requested but suffered or permitted is work time).

## V. Ernest Miller's Claim

In contrariety to the deposition of Patricia, the deposition of Ernest is imbued with generalities, lack of particularity, vagueness, and inexactitude in regard to any mandatory, specific pre-shift activities. The conclusory and non-specific testimony of Ernest fails to survive the grant of summary judgment. We agree with the circuit judge in his grant of summary judgment as to all claims of Ernest.

## *CONCLUSION*

Amalgamating our analysis of the FLSA, the Portal–to–Portal Act, the de minimis rule, and policy aspects of the FLSA, we come to the ineluctable conclusion that the grant of summary judgment as to the claim of Patricia Miller is erroneous and is reversed. We affirm the grant of summary judgment as to all claims of Ernest. Accordingly, the trial judge's order granting summary judgment as to Ernest Miller is **AFFIRMED IN RESULT and REVERSED and RE-MANDED** as to Patricia Miller.

**AFFIRMED IN RESULT** as to **Ernest Miller; RE-VERSED and REMANDED** as to **Patricia Miller.**

STILWELL and WILLIAMS, JJ., concur.