**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARISELA AGUILAR; MIGUEL
BLANCO; FRANCISCO J. CARRANZA;
RAFAEL GALLEGOS; BENJAMIN
GUERRERO, JR.; VAUGHN D. HAYES,
SR.; JOSE R. HERNANDEZ; ROGELIO
HERNANDEZ; ROMAN JAUREGUI;
EFREN JIMENEZ; FLAVIO LARA;
SIXTO NAVARRETE; ANTHONY
GUADALUPE ORDAZ; ARMANDO
PACHECO, JR.; ALAN PEREZ;
RIGOBERTO RODARTE; ANTONIO
VASQUEZ; ADRIAN VILLALOBOS,
a/k/a Jose Adrian Villalobos; MARIA
ACEVEDO; ANGEL AGUILAR;
EZEQUIEL ALVARADO; RICARDO
ANGULO; FERNANDO APODACA;
RENE ARREOLA; ANNETTE BAEZA;
JUAN BAEZA; REYMUNDO
BALDERRAMA; JUSTIN BARBA;
RAMON BAXTER; STEPHANIE
BERTOLLI; PEDRO BLANCO; DANIEL
BOADO; ANTHONY CALLA; LESLIE
CAMARILLO; YOLANDA CAMPOS;
STEFANY CARRANZA; JENNIFER
COOPER; EDWARD DANG; LUIS
DORADO; LUZ DUARTE; MIGUEL
DUENAS; JIM ESCALERA; HIRAM
ESCOBAR; JAIME ESCOBAR; MARTIN
L. ESPINOSA; CAROLINA ESTRADA;
GUADALUPE ESTRADA; CHRISTINE
FIERRO; JOSE FUENTES; MICHELLE
GALLEGOS; ALBERT GARCIA;
ANTHONY GARCIA; ARTURO
GARCIA; EDWARD GARCIA; CAESAR
GONZALEZ; JUAN GONZALEZ; RAUL
GUZMAN; DAVID HERNANDEZ;

No. 17-2198

JESUS HERNANDEZ; PAUL HERNANDEZ; GINO HIJAR; JUN KOO; ROCIO D. LEZA; CHRISTOPHER MACIAS; ANGEL MALDONADO; ARTURO MARES; DANIEL MARQUEZ; PEDRO MARTINEZ; SAUL MARTINEZ; YVONNE MARTINEZ; JUAN MATAMOROS; YARETH MIRELES; GABRIEL MOLINA; ARTURO MONTERO; CARLOS MONTESINOS; CECILIA MORALES; JESUS MORALES; YVETTE MOREHEAD; NORMA MUNIZ; SANDRA NERIA; HERNAN NEVAREZ; ERICA NIETO; ERIK ONTIVEROS; GARY LEE OROZCO; LUIS ORTIZ; ROBERT ORTIZ; DAVID PADILLA; JUAN PARRA; VERONICA PENA; CARLOS PONCE; JORGE PORTILLO; OSCAR PORTILLO; JOSE I. PROSPERO; ISELA QUEZADA; EDGAR RAMIREZ; MIGUEL RAMIREZ; YGNACIO RAMIREZ; GUSTAVO RAMON; RODOLFO RINCON, SR.; RODOLFO RINCON, JR.; ALBERTO RIVERA; JENNIFER RIVERA; DANIEL RODRIGUEZ; OSCAR RODRIGUEZ; RUBEN RODRIGUEZ; VINCE ROMAN; CARLOS ROSALES; ABEL SAENZ; LILA SAENZ; BELINDA SANCHEZ; DAVID SANCHEZ; ABRAHAM SANDOVAL; GABRIELA SIFUENTES; SALVADOR SIFUENTES; IRMA SOTO; IRENE TERRAZAS-RUBIO; MANUEL VASQUEZ; ADRIANA VILLALOBOS; KARINA VILLALOBOS; SASHA VILLALVA; MEAGAN VILLIGAN,

Plaintiffs - Appellants,

v.

MANAGEMENT & TRAINING

2

CORPORATION, d/b/a MTC,

Defendant - Appellee.

———————————————————

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:16-CV-00050-WJ-GJF)**

———————————————————

John P. Mobbs, El Paso, Texas, for Plaintiffs-Appellants.

Aaron C. Viets, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico (Charles J. Vigil, with him on the brief), for Defendant-Appellee.

———————————————————

Before **BACHARACH**, **EBEL**, and **MORITZ**, Circuit Judges.

———————————————————

**MORITZ**, Circuit Judge.

———————————————————

A group of 122 detention officers (the officers) who work or worked at Otero County Prison near Chaparral, New Mexico, allege that their employer, Management & Training Corporation (MTC), fails to pay them for certain activities that they engage in before they arrive at, when they arrive at, and after they leave their posts within the prison. According to the officers, these activities constitute compensable work, so MTC's failure to pay violates both the Fair Labor Standards Act (FLSA) of 1938, 29 U.S.C. §§ 201–19, and the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-1 to 50-4-33.[1]

---

[1] Below, the district court concluded that the officers "concede[d] that if summary judgment was granted to their federal claims, it would also apply to the state law claims." App. vol. 5, 1184. The officers take a different position on appeal, insisting that state and federal law treat compensability differently, such that even if

3

As explained below, we conclude that in this context, these activities constitute compensable work. Further, we reject MTC's arguments that (1) the time the officers devote to these activities is de minimis and (2) it need not pay the officers for these activities because it did not know the officers were engaging in them. Additionally, we conclude that the officers' rounding claim survives summary judgment. As such, we reverse the district court's order awarding summary judgment to MTC and remand for further proceedings.

**Background**

The officers are "[r]esponsible for the custody and discipline of detainees." App. vol. 3, 573. Among other duties, the officers "[s]earch for contraband and provide security"; "[c]ount, feed[,] and supervise detainees in housing, work[,] and other areas"; and "prepare and maintain records, forms[,] and reports." *Id.* The officers generally work eight-hour shifts, five days a week. There are three shifts, beginning at 6 a.m., 2 p.m., and 10 p.m. Each officer is typically assigned to work his or her shift at a specific post, and there are more than 30 posts within the prison.

Because this case concerns the activities that the officers engage in before they arrive at and after they leave their posts, as well as one activity at post, we begin by briefly outlining the officers' undisputed daily routine. (We will later describe certain of these activities in greater detail, as necessary to our analysis.)

---

their federal claims fail, their state claims survive summary judgment. Because we ultimately find in the officers' favor under federal law, we need not address the officers' argument on appeal or separately discuss their state-law claims.

4

When the officers arrive at the prison, they initially undergo a security screening. Then—in what the parties characterize as a "pre[]shift briefing"—some officers receive post assignments from a supervisor. App. vol. 5, 1158. During the preshift briefing, officers sometimes receive paperwork or additional information about their post for that day. Next, some officers obtain the keys they need for the day's post from a fingerprint-activated box. And some or most officers collect any equipment they need for the day, such as handcuffs, a radio, or pepper spray, from the prison's inventory-control system. The officers then walk to their posts, where they receive a "pass[]down briefing" from the officer leaving the post. Aplt. Br. 5. After working their shifts, departing officers complete several of the same tasks in reverse: they provide a passdown briefing to an incoming officer, walk back from their post, and return their keys and equipment to the fingerprint-activated box and the prison's inventory-control system, respectively.[2]

MTC requires the officers to use a time clock to precisely record their arrival and departure times; officers clock in after undergoing the security screening and clock out after returning their keys and equipment. Nevertheless, MTC generally pays the officers based on their scheduled eight-hour shifts rather than on the precise times at which they clock in and out. The one exception to this policy is the ten-minute adjustment rule: if an officer clocks in or out more than ten minutes before or

---

[2] The precise amount of time the officers devote to these activities is disputed. The district court concluded that the officers devote no more than eight minutes per shift to completing these activities; the officers contend that the time exceeds ten minutes per day. But as we explain later, this dispute is not material to our analysis.

after his or her shift start or end time, MTC will pay the officer based on the time clock rather than on his or her scheduled shift. That is, if an officer clocks in for a 6 a.m. shift at 5:58 a.m. and clocks out at 2:09 p.m., MTC will pay that officer for the eight-hour shift (i.e., from 6:00 a.m. to 2:00 p.m.); but if an officer clocks in for that same shift at 5:45 a.m. and clocks out at 1:49 p.m., MTC will pay that officer based on the time clock (i.e., for eight hours and four minutes). This rule applies on either end of the shift time, so that if an officer clocks in at 5:49 a.m. and clocks out at 1:56 p.m., MTC will pay that officer for time worked from 5:49 a.m., the clock-in time, to 2 p.m., the shift-end time (i.e., for eight hours and 11 minutes). In addition, MTC provides officers with time-adjustment forms, which the officers can complete to request payment if they devote time outside of their scheduled shift to compensable work.

The officers contend that MTC's compensation system deprives them of overtime pay in two ways. First, they allege that because MTC typically pays them based on shift time rather than clock time, it fails to pay them for the time they devote to undergoing the security screening, receiving the preshift briefing, checking keys and equipment in and out, walking to and from post, and conducting passdown briefings. Second, the officers allege that MTC's ten-minute adjustment rule routinely rounds down their work time, resulting in systematic underpayment.

Following discovery, MTC moved for summary judgment. It argued that officers do not perform compensable work under the FLSA when they undergo the security screening, receive the preshift briefing, check keys and equipment in and

6

out, walk to and from post, and conduct passdown briefings. Further, MTC alternatively argued that if any of that time was compensable, it was de minimis and thus not recoverable. *See* 29 C.F.R. § 785.47 (providing that "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded"). MTC additionally (1) insisted that it did not impermissibly round off the officers' working time and (2) raised an estoppel defense, arguing that it need not pay the officers because it did not know the officers were engaging in these activities.

The district court ruled that of the activities the officers described, only the passdown briefing was integral and indispensable to the officers' principal activities and therefore compensable. But the district court ultimately concluded the officers were not entitled to compensation for the time devoted to conducting passdown briefings because that time was de minimis. It further rejected the officers' rounding claim. As such, the district court granted MTC summary judgment on all of the officers' claims (without reaching MTC's estoppel defense). The officers appeal.

## Analysis

"We review the district court's summary[-]judgment decision de novo, applying the same standards as the district court." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017). "Under these standards, '[s]ummary judgment is proper if, viewing the evidence in the light most favorable to the non[]moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

7

matter of law.'" *Id.* (first alteration in original) (quoting *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013)).

## I.    Compensable Work

The FLSA requires an employer to pay employees for their work, but it does not define what kinds of activities qualify as compensable work. *See* 29 U.S.C. §§ 206–07; *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014). Confronting that absence, the Supreme Court initially defined compensable work as "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Busk*, 574 U.S. at 31 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–691 (1946)). But Congress narrowed that definition when it enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–62, which carves out two exclusions from the FLSA's definition of compensable work. *See Busk*, 574 U.S. at 32–33. First, the Act provides that the time an employee devotes to "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" is not compensable. 29 U.S.C. § 254(a)(1). Second, the Act provides that the time devoted to "activities which are preliminary to or postliminary to [the employee's] principal activity or activities" is not compensable. § 254(a)(2).

Determining whether an activity is "preliminary to or postliminary to . . . [a] principal activity or activities" requires deciding what constitutes an employee's "principal activity or activities." *Id.* Courts have defined this phrase to include both the principal activities themselves and "all activities which are an 'integral and

8

indispensable part of the principal activities.'" *Busk*, 574 U.S. at 33 (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005)); *see also* 29 C.F.R. § 790.8(b), (c). In turn, an activity is "integral and indispensable . . . if it is an intrinsic element of those [principal] activities and one with which the employee cannot dispense if [the employee] is to perform his [or her] principal activities." *Busk*, 574 U.S. at 33. Critically, the integral-and-indispensable inquiry does not turn on whether the employer requires the activity or whether the activity benefits the employer.[3] *Id.* at 36. Instead, the question is "tied to the productive work that the employee is *employed to perform*." *Id.*

Here, the parties agree that the officers' principal activities include maintaining "the custody and discipline of inmates," "supervising detainees," "searching for contraband[,] and providing security." App. vol. 3, 446. But the officers argue that the district court erred when it concluded that the officers' activities before they reach their posts and after they leave their posts are

---

[3] Before the Supreme Court decided *Busk*, courts routinely decided the integral-and-indispensable issue by asking these two questions: whether the employer required the activity or whether the activity benefited the employer. *See, e.g.*, *Whelan Sec. Co. v. United States*, 7 Cl. Ct. 496, 498–99 (1985). But the *Busk* court specifically rejected those approaches as "overbroad." *Busk*, 574 U.S. at 36. Accordingly, *Busk* effected a change in the law. Thus, to the extent a pre-*Busk* case turned on these now-disapproved rationales, its analysis of the integral-and-indispensable issue is inapposite. *See Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 227–28 (5th Cir. 2017) (rejecting reliance on pre-*Busk* cases whose rationales were no longer applicable). However, to the extent that a pre-*Busk* case did not turn on these now-disapproved rationales, it remains on point. So, throughout this opinion, we disclaim reliance on pre-*Busk* cases that turned on these now-disapproved rationales but continue to rely on pre-*Busk* cases that did not.

9

noncompensable preliminary and postliminary activities that are not integral or indispensable to these principal activities. For the reasons explained below, we conclude that all these activities—undergoing the security screening, receiving the preshift briefing, picking up and returning keys and equipment, and walking to and from post—are integral and indispensable to the officers' principal activities.[4]

## A.    Preshift Activities[5]

We begin with the first activity of the officers' day: the security screening. During the security screening—which occupies between three and eleven minutes— the officers empty their pockets, remove their jackets and all metal, sometimes remove their boots, present any briefcases, lunchboxes, or bags for inspection, and walk through a metal detector before reclaiming their possessions. MTC requires and conducts the security screening to ensure "the overall safety of the prison" and to prevent officers from inadvertently or intentionally bringing contraband like weapons or cell phones into the prison. App. vol. 3, 559.

The district court determined that the screening was "a preliminary security measure" that was not integral or indispensable to the officers' principal activities. App. vol. 5, 1158. In reaching this conclusion, the district court relied on *Busk*, in

---

[4] We also conclude, albeit for a different reason than the district court did, that the one activity occurring *at* post, the passdown briefing, is integral and indispensable to the officers' principal activities.

[5] For ease of reference, we refer to the security screening, preshift briefing, key and equipment pickup, walk to post, and preshift passdown briefing as "preshift activities." Likewise, we refer to the postshift passdown briefing, walk back from post, and key and equipment return as "postshift activities."

10

which the Supreme Court held that a postshift security screening was not compensable under the FLSA. *See* 574 U.S. at 36. *Busk* involved warehouse employees whose job functions included "retriev[ing] products from warehouse shelves and packag[ing] those products for shipment." *Id.* at 35. To deter theft, the employer required the employees to undergo a postshift security screening. *Id.* The Supreme Court held that the screening was not compensable work because it was not integral or indispensable to the employees' principal activity of retrieving and packaging items from warehouse shelves. *Id.* In fact, the employer "could have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.*

But as the officers point out, *Busk* did not hold that a security screening can never be compensable. Instead, the Court explained that whether an activity is compensable depends on "the productive work that the employee is employed to perform." *Id.* at 36. And that "productive work" marks the critical distinction between *Busk* and this case. *Id.* There, the theft-prevention, postshift security screening was not "tied to" the work of retrieving items from warehouse shelves. *Id.* Indeed, there was no connection at all between the work and the screening.

We cannot say the same here. MTC conducts the security screening to prevent weapons and other contraband from entering the prison. And keeping weapons and other contraband out of the prison is necessarily "tied to" the officers' work of providing prison security and searching for contraband. *Id.* Indeed, the security screening and the officers' work share the same purpose.

11

MTC resists this connection, encouraging us to adopt the district court's reliance on *Busk*'s suggestion that neither "searches conducted for the safety of the employees [nor] those conducted for the purpose of preventing theft" were integral or indispensable. *Id.* This statement in *Busk* concerned an opinion letter issued by the Department of Labor in 1951. *Id.* at 35. The Department's letter explained that for employees in a rocket-powder plant, neither a preshift search aimed at preventing matches and cigarette lighters from entering the plant nor a postshift search aimed at preventing theft was compensable. *Id.* So, the *Busk* court reasoned, the Department drew no distinction between searches for employee safety and searches to prevent theft. *Id.* at 35–36.

But the Department based its opinion letter on significantly different circumstances than those presented here. The screenings here are obviously not aimed at preventing theft. Neither are they necessarily analogous to the safety searches at the rocket-powder plant. And notably, neither the Department's opinion letter nor the Court in *Busk* clearly outlined the principal activities of the employees at the rocket-powder plant. But the *Busk* Court explained that the plant's preshift search was aimed at "the safety of employees." *Id.* Standing on its own, an employer's general desire to keep its employees safe has no clear or obvious connection to the particular activities those employees are employed to perform. Here, by contrast, the officers' principal duties include "searching for contraband and providing security." App. vol. 3, 446. So even if this security screening relates in part to overall prison safety, what matters is that the screening is "tied to" the productive

12

work that MTC employs the officers to perform, rendering it integral and indispensable to those duties.[6] *Busk*, 574 U.S. at 36.

Moreover, unlike the employer in *Busk*, MTC could not "have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.* at 35; *see also id.* at 37–38 (Sotomayor, J., concurring) (explaining that the question is whether employees "could not dispense with [the security screening] without impairing [their] ability to perform the[ir] principal activit[ies] safely and effectively"). Arguing against this conclusion, MTC contends that an officer "can obviously maintain custody and discipline of inmates whether or not the officer walked through a metal detector earlier." Aplee. Br. 17. But indispensability does not depend upon whether the officers could perform some aspect of their jobs in the absence of the activity; the question is whether the employer "could have eliminated the screenings altogether without impairing the employees' ability to complete their work," *Busk*, 574 U.S. at 35; *see also id.* at 37–38 (Sotomayor, J., concurring).

---

[6] MTC also urges us to adopt the district court's distinction between "searching for contraband" and "being searched for contraband." App. vol. 5, 1157. But we find this distinction immaterial. Both "searching for" and "being searched for" contraband involve keeping contraband out of the prison and maintaining a secure prison environment. *Id.* Moreover, if MTC means to suggest that the officers are not performing work simply because they are passively undergoing screening rather than actively performing some duty, we reject that suggestion as well. The Court could have relied on such a distinction in *Busk*, but it did not—likely because such a distinction simply is not relevant to the integral-and-indispensable issue. Indeed, exertion typically is not part of the compensability analysis. *See Alvarez*, 546 U.S. at 25.

Here, if MTC were to forego officer screening, officers could inadvertently or intentionally bring weapons or other contraband into the prison. The introduction of weapons or other contraband into the prison would most certainly result in a less secure prison. But more importantly, it would "impair[]" the officers' ability to provide security and search for contraband, *id.* at 35, as well as their ability to do so "safely and effectively," *id.* at 37–38 (Sotomayor, J., concurring); *see also Steiner v. Mitchell*, 350 U.S. 247, 249–53, 255–56 (1956) (holding that time spent changing clothes and showering was compensable because without doing so, battery-plant workers could not *safely* perform principal activity of producing batteries in highly toxic environment); *Mitchell v. King Packing Co.*, 350 U.S. 260, 262–63 (1956) (holding that time spent sharpening knives was compensable because butchers could not *effectively* cut meat without sharpening). Stated more plainly, an officer cannot safely and effectively maintain "custody and discipline of inmates" and "provid[e] security" while also bringing weapons or contraband into the prison. App. vol. 3, 446; *see also Busk*, 574 U.S. at 37–38 (Sotomayor, J., concurring). The security screening in this case is therefore indispensable to the officers' principal activities.

Additionally, preventing weapons or other contraband from entering the prison, by way of the security screening, is "an intrinsic element of" the officers' security work. *Busk*, 574 U.S. at 33. Again, the security screening and the officers' work share the same goal: maintaining a secure prison environment by preventing contraband from inadvertently or intentionally entering the prison. Thus, under these factual circumstances, we conclude that the screening is an integral part of what

14

MTC employed the officers to do. *See id.* And because the screening is both integral and indispensable to the officers' principal activities, the district court erred in ruling otherwise and in granting summary judgment to the officers on this issue.

Because the time the officers devote to undergoing the security screening is integral and indispensable to their principal activities, that activity begins their workday. *See id.* at 33 (defining principal activities to include those activities that are integral and indispensable to principal activities); *Alvarez*, 546 U.S. at 28 (noting that workday begins with commencement of principal activities). And under the continuous-workday rule, "[o]nce the work[]day starts, all activity is ordinarily compensable until the work[]day ends." *Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1243 (10th Cir. 2016); *see also* 29 C.F.R. § 790.6(a) (providing that Portal-to-Portal Act does not apply to activities performed "after the employee commences to perform the first principal activity on a particular workday and before [the employee] ceases the performance of the last principal activity on a particular workday"). Thus, we further hold that the time the officers devote to receiving the preshift briefing, picking up keys and equipment, walking to post, and conducting the preshift passdown briefing is also compensable under the FLSA.

### B.    Postshift Activities

Because the continuous-workday rule makes compensable all activities that occur from the moment that "the work[]day starts . . . until the work[]day ends," *Castaneda*, 819 F.3d at 1243, we begin our postshift analysis with the last activity of

15

the officers' day: returning keys and equipment. If that activity is compensable, then so is the walk from post and the postshift passdown briefing. *See id.*

Not every officer returns keys and equipment, but many do. The district court found that "the number of officers who pick up equipment at central control [and therefore must return it] varies from less than 50% . . . to less than 83%." App. vol. 5, 1162. The keys are stored in a fingerprint-activated box, and MTC maintains a key log indicating who possesses each key and when the keys are checked in and out. Access to the equipment is similarly controlled; officers use "individualized metal coins, called 'chits'" to record who checks particular pieces of equipment in and out. App. vol. 3, 957. Importantly, these processes help ensure that inmates do not obtain possession of keys or equipment and thus are necessary to maintain the security of the prison.

The district court found that the keys and equipment were "to be sure, useful and helpful to the officers in doing their jobs." App. vol. 5, 1168. In particular, the district court specifically noted that the officers "use keys to guard the inmates and to lock and unlock doors to ensure security"; "use radios to communicate with officers at their posts and to give them directions and instructions throughout the day"; and use "[h]and restraints and pepper spray . . . as both a deterrent and if necessary, to control unruly inmates." *Id.* at 1164. Based on these findings, we have little difficulty concluding that picking up and returning the keys and equipment is indispensable to the officers' ability to perform their work. If MTC were to eliminate the keys and equipment (or the corresponding inventory-control systems), the officers' ability to

16

maintain custody and discipline of inmates and provide security in the prison would be "impair[ed]." *Busk*, 574 U.S. at 35; *see also id.* at 37–38 (Sotomayor, J., concurring). Indeed, an officer "cannot dispense" with the keys and equipment "if [the officer] is to perform his [or her] principal activities" of maintaining custody and discipline of inmates and providing security. *Id.* at 37.

Despite this indispensability, the district court concluded that picking up and returning keys and equipment was not "an 'intrinsic element' of the officers' principal activities." App. vol. 5, 1168 (quoting *Busk*, 574 U.S. at 35). The district court began its analysis by distinguishing or rejecting each of the cases that the officers cited in support of finding compensability. In so doing, it emphasized that "the type of tools and equipment carried by the officers are small in size and not burdensome to carry." *Id.* Then, without additional analysis, the district court concluded that although "certain pre[]shift activities are *necessary* for employees to engage in their principal activities," that fact "does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" *Id.* (quoting *Alvarez*, 546 U.S. at 40).

On appeal, the officers argue that checking keys and equipment in and out is integral and indispensable to their principal activities. In support, they first cite a variety of cases in which courts have held that picking up equipment is a compensable activity. *See Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454–55 (5th Cir. 2009) (unpublished); *Whelan Sec.*, 7 Cl. Ct. at 498–99; *Baylor v. United States*, 198 Ct. Cl. 331, 357–58 (1972); *U.S. Dep't of Justice v.*

17

*Am. Fed'n of Gov't Emps. Local 919*, 59 F.L.R.A. 593, 597–98 (2004). But each of these cases was decided before the *Busk* Court refined the integral-and-indispensable test by rejecting formulations of this test that turn solely on whether "an employer required a particular activity" or "whether the activity is for the benefit of the employer." 574 U.S. at 36. And each of these cases turn specifically on one or both rejected rationales. *See Von Friewalde*, 339 F. App'x at 454–55 (finding that "checking specialized tools in and out of the tool crib" was compensable activity for airplane mechanics because it was for employer's benefit); *Whelan Sec.*, 7 Cl. Ct. at 498–99 (finding time that security guards spent picking up weapons was compensable because it was for employer's benefit); *Baylor*, 198 Ct. Cl. at 357–58 (same); *Am. Fed'n of Gov't Emps.*, 59 F.L.R.A. at 597–98 (finding that time federal correctional officers spent picking up keys and equipment was compensable because employer required such activities). Thus, we do not rely on these cases because their reasoning does not survive *Busk*. *See Bridges*, 875 F.3d at 227–28; *supra*, note 3.

But the officers' argument extends beyond these superseded cases. The officers contend that "when an employee must pick up *specialized equipment* from his [or her] employer to perform his [or her] duties, that [activity] is part of his [or her] principal work activity." Aplt. Br. 34 (emphasis added). In support, they rely on *Brantley v. Ferrell Electric, Inc.*, 112 F. Supp. 3d 1348 (S.D. Ga. 2015), and *Alvarado v. Skelton*, No. 3:16-3030, 2017 WL 2880396 (M.D. Tenn. July 6, 2017) (unpublished). In *Brantley*, the district court held that "collecting and loading the specific parts necessary to complete" electrical work was "intrinsic in installing,

18

servicing, and repairing electrical equipment." 112 F. Supp. 3d at 1371. And in *Alvarado*, the district court found that time spent picking up and loading required landscaping tools and equipment onto work trucks triggered the start of the workday for landscaping employees. *See* 2017 WL 2880396, at *5.

Here, as in *Brantley* and *Alvarado*, the close connection between (1) the keys and equipment and (2) the nature of the officers' work convinces us that checking out and returning these items is "an intrinsic element" of providing security in the prison. *Busk*, 574 U.S. at 37; *see also Peterson v. Nelnet Diversified Sols., LLC*, 400 F. Supp. 3d 1122, 1135 (D. Colo.) ("Court[s] have long held that pre[]shift preparation of tools or equipment is considered integral and indispensable to the principal activities when the use of such tools in a readied or activated state is an integral part of the performance of the employee's principal activities."), *appeal docketed*, No. 19-1348 (10th Cir. Sept. 17, 2019). In particular, we note that the specialized nature of the keys and equipment ties the act of picking them up and returning them more closely to the officers' productive work. *See D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 554–55 (10th Cir. 1958) ("[E]mployees who transport equipment without which well servicing could not be done[] are performing an activity which is so closely related to the work which they and the other employees perform[] that it must be considered an integral and indispensable part of their principal activities."); *cf. Smith v. Aztec Well Servicing, Inc.*, 462 F.3d 1274, 1289 (10th Cir. 2006) (finding that activity of putting personal, nonspecialized equipment into van was not compensable activity).

Moreover, the specialized nature of the keys and equipment in this case is further reinforced by the mandatory procedures that each officer must comply with when obtaining or returning keys and equipment. Recall that in the interest of overall prison safety, the keys are stored in a fingerprint-activated box, and MTC maintains a log of when each key is checked out, who checks it out, and when it is returned. Further, in order to check in or out particular pieces of equipment, officers must use individualized metal coins—or "chits"—that record who possesses the equipment. App. vol. 5, 957.

Not only does this inventory-control system emphasize the specialized nature of keys and equipment in the prison context, it further buttresses our conclusion that the process of checking the keys and equipment in and out is intrinsic to the officers' principal activities of maintaining custody and discipline of inmates and providing security. Similar to the security screening, the inventory controls exist to ensure the overall safety of the prison environment. Indeed, "inmates are never allowed access to keys for security reasons," and the equipment-monitoring system exists "to monitor the equipment and make sure it does not get into the hands of inmates." App. vol. 5, 956–57. So the keys and equipment are not just necessary to the officers' work—the time devoted to checking those items in and out of the inventory-control systems is also closely aligned with their principal activities of maintaining custody and discipline of inmates and providing security. *Cf. Peterson*, 400 F. Supp. 3d at 1130 (noting that "activities which are necessary to perform one's work but not

substantively connected to the actual performance of such work are not considered compensable").

Not to be deterred, MTC argues that we should find this activity not compensable based on the distinction the district court drew between the easy-to-carry keys and equipment at issue here and the heavy and burdensome equipment at issue in cases like *Brantley* and *D A & S Oil Well Servicing*. But exertion is not typically considered as part of the compensability analysis. *See Alvarez*, 546 U.S. at 25 (noting that "'exertion' [i]s not in fact necessary for an activity to constitute 'work' under the FLSA" (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944))). Nevertheless, MTC argues "the case[]law suggests that the simpler, faster, and easier it is to get and carry the items, the more likely these actions are to be preliminary" and not compensable. *See, e.g.*, *D A & S*, 262 F.2d at 555 n.5 (citing with approval regulation that distinguished between carrying power saw versus carrying "ordinary hand tools"); *Clay v. Huntington Ingalls, Inc.*, No. 09-7625, 2011 WL 13205917, at *10 (E.D. La. Sept. 29, 2011) (unpublished) ("[T]he act of merely retrieving and toting a pair of pliers and a screwdriver is not going to trigger the start of the continuous workday.").

But MTC's argument overlooks the distinct circumstances of this case: although the keys and equipment may be easy to carry, they are not simple or easy to obtain; officers must collect the keys from a fingerprint-protected box, check the equipment out using chits, and maintain responsibility for those items until they are checked back in at the end of the shift. And perhaps more importantly, this easy-

21

versus-burdensome distinction is not particularly helpful in determining the connection between the tools and the work the officers are employed to perform. *See Busk*, 574 U.S. at 36 (noting that integral-and-indispensable question turns on whether activity "is tied to" work employee performs); *D A & S Oil Servicing*, 262 F.2d at 555 (noting that transporting tools was integral and indispensable because tools were "closely related" to work performed).

We thus decline MTC's implicit invitation to stray from the Supreme Court's direction in *Busk.* That direction requires us to determine whether an activity is integral and indispensable by considering how closely the activity "is tied to the [employee's] productive work." 574 U.S. at 36. Generic tools and equipment like screwdrivers and paperwork are common to a variety of jobs and therefore play no specialized role in most types of work, no matter how necessary they might be to a particular job. But items like handcuffs, pepper spray, and prison-door keys are closely connected to the work of providing prison security.

Indeed, the district court specifically noted that some of the officers' "essential functions" were to "[t]ransfer and transport detainees"; "[r]estrain and secure assaultive detainees"; and "perform use of force procedures, including the use of chemical agents to control detainees." App. vol. 5, 1168. It seems obvious that an officer could not effectively complete these "essential functions" if the officer had not checked out the keys needed to move a detainee, the handcuffs needed to restrain or secure a detainee, or the pepper spray used to control a detainee. *Id.*; *see also King Packing Co.*, 350 U.S. at 262 (holding that time butchers spent sharpening knives

22

was compensable because dull knives would "slow down production," affect meat quality, and lead to "accidents"). Further, the inventory-control system from which the officers obtain the keys and equipment is essential to the officers' principal activities of providing prison security because it prevents inmates' access to the keys and equipment.

As such, because of the specialized nature of the keys and equipment, the inventory-control systems, and the officers' principal activities in the prison environment, we hold that checking keys and equipment in and out of the prison's inventory-control systems is integral and indispensable to the officers' principal activities of maintaining custody and discipline of the inmates and providing security. *See Busk*, 574 U.S. at 37. And because returning the keys and equipment is the last principal activity in the officers' workday, the postshift activities that take place before that—the postshift passdown briefing and walking back from post—are also compensable. *See Castaneda*, 819 F.3d at 1243. Thus, the district court erred in granting summary judgment to MTC on this issue.

## II. De Minimis Doctrine

We next consider whether the amount of time that the officers devote to these compensable pre- and postshift activities is de minimis and therefore not compensable. But before undertaking this analysis, we pause to note that MTC's briefing on the de minimis issue assumes that only the passdown briefings are compensable. As such, MTC never makes the argument necessarily presented by our conclusion that all the pre- and postshift activities are compensable: that the de

23

minimis doctrine applies even in these circumstances. Accordingly, because MTC did not address this argument in its prinicpal brief, we could decline to consider the de minimis doctrine at all. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). Yet assuming MTC did make such an argument, we reject it on the merits for the reasons explained below. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176 (7th Cir. 2011) (noting that employer bears the burden of establishing that de minimis doctrine applies).

The de minimis doctrine provides that "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded." § 785.47. At the same time, "[a]n employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time [the employee] is regularly required to spend on duties assigned to [the employee]." *Id.* The de minimis doctrine applies to "the amount of *daily* time spent on the additional work." *Reich v. Monfort*, 144 F.3d 1329, 1333 (10th Cir. 1998) (emphasis added) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984)); *see also Hootselle v. Mo. Dep't of Corrs.*, No. WD 82229, 2019 WL 4935933, at *4 & n.6 (Mo. Ct. App. Oct. 8, 2019) (aggregating, for purposes of de minimis analysis, time devoted to compensable pre- and postshift activities). We apply a three-factor test to determine whether work time is de minimis and therefore not compensable: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and

(3) whether the [employees] performed the work on a regular basis." *Castaneda*, 819 F.3d at 1243 (quoting *Monfort*, 144 F.3d at 1333–34).

Before applying the three factors, we must first estimate the amount of time at issue. *Monfort*, 144 F.3d at 1333 n.1. "There is no precise amount of time that may be denied compensation as de minimis." *Id.* at 1333. And we have approvingly cited cases finding that "as little as ten minutes of working time goes beyond the level of de minimis." *Id.* (quoting *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994)).

Here, the amount of time that officers spend daily on compensable pre-and post-shift activities is not entirely clear. The district court concluded that the amount of time was "substantially less than . . . eight minutes per shift." App. vol. 5, 1181. The district court appears to have derived that number from the parties' summary-judgment briefing: MTC calculated eight minutes per shift as the most favorable number for the officers, and the officers likewise estimated eight minutes per shift (although they elsewhere argued that the amount of time was more than ten minutes). Because the district court concluded that only the passdown briefing was compensable, it accordingly found that the time was "*substantially less* than . . . eight minutes per shift." *Id.* (emphasis added). But because we have concluded that all of the officers' pre- and postshift activities are compensable, we assume that the amount of time is at least eight minutes per shift.[7]

_____

[7] Indeed, it is likely more than eight minutes per shift. As MTC acknowledges, its ten-minute adjustment rule is based on the approximate amount of time it takes to get from the time clock—immediately following the security screening—to the posts. And because those ten minutes occur at both ends of an officer's shift, the amount of

The first de minimis factor, "the practical administrative difficulty of recording the additional time," weighs in the officers' favor—the time clock already tracks most of the time at issue.[8] *Monfort*, 144 F.3d at 1334 (quoting *Reich v. N.Y.C. Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995)). The time clock is located just past the metal detector and captures all of the compensable activities except the screening itself. Further, it is possible to estimate the average time the officers devote to screening. *See Kellar*, 664 F.3d at 176–77 (noting that because employees performed the same activities every day, "it would have been possible to compute how much time" employee spent on them); *Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1059 (9th Cir. 2010) (noting that even though "it may be difficult to determine the actual time" at issue, "it may be possible to reasonably determine or estimate the average time"). Thus, because MTC already records the majority of the time at issue and could reasonably estimate the time that it does not record, this factor weighs in the officers' favor.

Next, "the aggregate amount of compensable time"—a factor that considers both the aggregate claim for each individual officer as well as the aggregate claim for all the officers combined—also weighs in the officers' favor. *Monfort*, 144 F.3d at

time could be as much as 20 minutes. (It is likely not more than 20 minutes because if an officer works more than ten additional minutes on either end of a shift, MTC pays him or her for that time under the ten-minute adjustment rule.)

[8] The district court found otherwise, but that is because it considered only the passdown briefing. We reach a different conclusion on this factor because we consider all of the officers' compensable activities, beginning with the security screening and ending with the return of keys and equipment.

1334. The district court did not make an express finding about the aggregate amount of compensable time; instead, it concluded that the aggregate claim for all the officers combined was substantially less than the amount that MTC provided in its summary-judgment motion, $355,478, because that number included compensation for time devoted to noncompensable activities.[9] The district court then weighed that finding in MTC's favor because a number less than $355,478 was substantially less than the $1.6 million that we weighed in the plaintiffs' favor in *Monfort*.

But we cannot rely upon the district court's less-than-$355,478 conclusion because that conclusion turned on the underlying determination that only the passdown briefing was compensable. Because we have concluded that all of the officers' pre- and postshift activities are compensable, we assume that the aggregate claim is *at least* $355,478.[10]

And more importantly, the district court erred in treating *Monfort* as if it set a baseline below which all claims are negligible; rather, the court there merely noted

---

[9] MTC calculated this amount based on an officer who worked eight additional overtime minutes per shift, five days a week, for three years, and then multiplied that figure by 122 plaintiffs.

[10] Indeed, as with the amount of time at issue, the aggregate claim could be higher. On appeal, the officers provide a higher per-officer claim estimate "[b]ased on a representative sample of 15% of the officers" over "the four-year time period covered by this suit." Aplt. Br. 56. According to the officers, each officer's back-pay claim for this four-year time period averages $7,093.28. Although the officers do not provide an estimated aggregate amount in their briefing, multiplying their per-officer estimate by 122 plaintiffs results in an estimated total aggregate claim of $865,380.16. We need not accept this estimate to complete our analysis here. But we acknowledge it in order to emphasize both that (1) we base our de minimis analysis on assumptions and estimates, rather than definitive numbers, and (2) those assumptions and estimates are arguably conservative.

that a $1.6 million claim "was very large." *Monfort*, 144 F.3d at 1334. In fact, more moderately sized claims are not automatically negligible. *See Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 374 (4th Cir. 2011) (noting that in case involving 280 employees, individual claims for $425 per year or $2,550 over six years were "significant"); *Lindow*, 738 F.2d at 1063 (suggesting $1 per week for 50 weeks would not be de minimis claim). Indeed, MTC cites no cases in which a court weighed a claim of this size in the employer's favor. Thus, we conclude that the aggregate size of the officers' claims is substantial and weighs in their favor.

As to the third factor, we conclude that the regularity with which the officers perform this work also favors the officers. *See Monfort*, 144 F.3d at 1334. The district court found that this factor balanced equally between the parties because (1) "[i]t is apparent that all officers receive pass[]down briefing[s]," but (2) "there is no fixed time any of them *must* show up on post for these briefings." App. vol. 5, 1182. We, of course, look at more than just the passdown briefings. And it seems clear that most officers perform most of these activities during most shifts. Indeed, MTC requires both the security screening and the passdown briefings, and it designed the ten-minute adjustment rule to account for the time it takes to get from the security screening to post. *See Monfort*, 144 F.3d at 1334 (weighing regularity factor in employees' favor where activities took about ten minutes each day); *Jimenez v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 697 F. App'x 597, 599 (10th Cir. 2017) (unpublished) (rejecting de minimis doctrine for required five-minute briefing period because time was regular and ascertainable). As such, we weigh this factor in the officers' favor.

28

In sum, and contrary to the district court's conclusions, all three factors weigh in favor of the officers: MTC already records most of the time at issue, the aggregate claim is substantial, and the officers regularly engage in these activities. As such, we find that the time at issue is not de minimis and conclude that the district court erred in granting summary judgment to MTC on this basis. *See Monfort*, 144 F.3d at 1334 (finding that time was not de minimis based on size of claim and regularity of work and despite administrative difficulty of recording time).

## III.    Suffer or Permit to Work

Next, MTC argues that even if the officers' activities are compensable, the officers should not be allowed to claim compensation for them because MTC did not know that the officers were doing this work. The district court did not reach this argument because it ruled against the officers on compensability. But we have reached the opposite conclusion. Thus, we address—but ultimately reject—MTC's position that it need not compensate the officers because it did not know the officers were engaging in this work.

The FLSA requires employers to pay employees when the employers "suffer or permit [employees] to work." 29 U.S.C. § 203(g); *see also Mencia v. Allred*, 808 F.3d 463, 470 (10th Cir. 2015). This provision creates a kind of FLSA estoppel doctrine: if an employer does not know that an employee is doing certain work, then the employer is not required to pay the employee for that work. *See Mencia*, 808 F.3d at 470. But if the employer is aware of the work and therefore "suffer[s] or permit[s]" the work, it must pay the employee. § 203(g); *see also Mencia*, 808 F.3d at 470.

29

Stated differently, "[a]n employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (second alteration in original) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)).

Here, MTC argues that it did not know the officers were working outside of their scheduled shifts because the officers (1) did not complete time-adjustment forms to request overtime pay and (2) signed an acknowledgement form included with each paycheck stating that they submitted such a form for any overtime work conducted before or after their shift. In other words, MTC maintains that it does not owe the officers compensation because it did not know they were working before and after their shift times. But as the officers point out, the facts here do not permit a logical leap from the absence of time-adjustment forms to MTC's lack of knowledge.

Indeed, the cases that MTC cites to support its position—that an employee's failure to use an overtime-compensation system always means that the employer does not know about the work being done—involve an employer's constructive knowledge. *See White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873–77 (6th Cir. 2012) (discussing whether employer should have known employee was working during lunch break); *Hertz v. Woodbury Cty*, 566 F.3d 775, 781–82 (8th Cir. 2009) (discussing appropriateness of jury instruction about whether employer should have known, based on nonpayroll records, that employees were working during

30

commutes and meal breaks); *Newton v. City of Henderson*, 47 F.3d 746, 748–50 (5th Cir. 1995) (discussing whether employer should have known employee was working overtime despite employer's express denial of overtime authorization and employee's failure to report overtime). These cases are not relevant here because, as the officers point out, this case involves MTC's *actual* knowledge that the officers are engaging in these activities. In particular, MTC *requires* both the security screening and the passdown briefing. It cannot simultaneously require an activity and claim to be unaware that employees are engaging in that activity. Further, it is undisputed that MTC often has supervisors conduct the preshift briefing; knows the officers check out keys and equipment because the officers use the inventory-control procedures; and knows they walk to and from their posts because they show up for work.

In sum, MTC pays the officers for the eight hours they are at their posts. But it knows that the officers are working outside those eight hours, on their way to and from post. And MTC "cannot stand idly by and allow [the officers] to perform overtime work without proper compensation, even if" the officers did not claim overtime compensation using the time-adjustment forms or sign acknowledgment forms. *Fairchild*, 815 F.3d at 964 (quoting *Harvill*, 433 F.3d at 441). We therefore reject MTC's contention that it did not "suffer or permit" the officers' work on their way to and from their posts. § 203(g).

## IV.    Rounding

Finally, we consider the officers' rounding claim, in which they allege that MTC's ten-minute adjustment rule routinely rounds down their work time, resulting

31

in systematic underpayment. Rounding is the practice of "recording the employees' starting time and stopping time to the nearest [five] minutes, or to the nearest one-tenth or quarter of an hour," or to some other consistent time increment. § 785.48(b); *see also McDonald v. Kellogg Co.*, No. 2011 WL 6180499, at *12–13 (D. Kan. Dec. 13, 2011) (unpublished) (considering rounding claim based on ten-minute adjustment rule); *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 819–20 (N.D. Ill. 2010) (considering rounding claim based on eight-minute adjustment rule). Federal regulation permits rounding as long as "it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *Id.*; *see also Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1075 (9th Cir. 2016) (noting that federal regulation has endorsed use of rounding for over 50 years). Stated differently, a valid rounding policy must be "neutral, both facially and as applied." *Corbin*, 821 F.3d at 1076 (quoting *See's Candy Shops, Inc. v. Superior Court*, 148 Cal. Rptr. 3d 690, 701 (Cal. Ct. App. 2012)). It must allow for rounding both up and down, so that an employee is sometimes compensated for time not spent working, and sometimes not compensated for time spent working. *See id.* at 1077.

Recall that under MTC's ten-minute-adjustment rule, if an officer clocks in or out more than ten minutes before or after his or her shift time, MTC will pay the officer based on the time clock rather than on his or her scheduled shift. But if an officer clocks in or out fewer than ten minutes before or after his or her start time, MTC will pay the officer based on his or her scheduled eight-hour shift rather than

the clock time—in other words, MTC rounds this time off. This rule is facially neutral because it rounds both up and down. *See id.* That is, an officer assigned to a 6 a.m. shift who clocks in at 5:51 a.m. and clocks out at 2:09 p.m. will be paid for eight hours, even though he or she worked at least an 18 additional minutes (nine on either side). Similarly, an officer who clocks in at 6:09 a.m. and out at 1:51 p.m. will also be paid for eight hours, even though he or she worked 18 fewer minutes (nine on either side).

But the officers presented evidence suggesting that the ten-minute adjustment rule is not neutrally applied. In particular, they submitted a representative sample showing that about 94% of the time, the officers were clocked in—and therefore were performing compensable pre- and postshift activities—for longer than their eight-hour shift time. And a rounding policy that works in the employer's favor 94% of the time is probably not neutrally applied.

Yet the district court rejected the officers' rounding claim. The basis for its decision is not entirely clear, but it concluded that because the officers are paid for their scheduled shifts under the ten-minute adjustment rule, their "theory of 'rounding' . . . violations is incongruous with" their other claims. App. vol. 5, 1155. In other words, the district court appears to have decided that because this case involves claims for *overtime* compensation—that is, for work completed outside of

the eight-hour shift—MTC's ten-minute adjustment rule "does not constitute 'rounding' as that concept is used in wage[-]and[-]hour law."[11] *Id.*

We disagree that rounding can never be relevant when considering claims for overtime compensation. The district court cited no authority to support this proposition, and we have found at least some authority to the contrary. Specifically, in *Russell*, the district court denied summary judgment to the employer defendant on the employees' rounding claim because if the employer's "time[-]rounding and log[-]out policies often caused [employees] to work *unpaid overtime* in increments of under eight minutes, then these company-wide practices *may have resulted in unpaid overtime work*." 721 F. Supp. 2d at 820 (emphases added).

Indeed, the district court's conclusion that rounding is never relevant to overtime claims appears to bypass the ultimate issue in this case. We are not concerned here with whether MTC pays the officers for their full eight-hour shifts; instead, we are concerned with whether MTC compensates them for work completed outside of those eight-hour shifts. And if the ten-minute adjustment rule routinely rounds off that compensable overtime, as the officers' evidence suggests, then the officers' rounding theory remains viable.

---

[11] The district court's ruling may also have turned at least in part on its conclusion that the officers' activities after clocking in but before arriving at their posts were not compensable: the district court noted that "under a true rounding system, employees are working immediately upon clocking in." App. vol. 5, 1154. Yet because we conclude here that these activities are compensable, the district court's rounding ruling is flawed to the extent that it turned on its compensability ruling.

34

At this stage of the litigation, MTC has not countered the officers' evidence on the non-neutrality of its ten-minute adjustment rule. Indeed, MTC's only argument against the rounding claim, both below and on appeal, is that the ten-minute adjustment rule does not amount to rounding because the officers are not doing compensable work during the time that is rounded off the time clock. We have found to the contrary. Thus, although "employees who voluntarily come in before their regular starting time or remain after their closing time[] do not have to be paid for such periods" as long as "they do not engage in any work," those are not the facts of this case. § 785.48(a). And because it appears that the officers have met their initial burden to show that they are routinely paid only for their shift time even though they regularly arrive early, leave late, and do work during that time, the district court erred in granting summary judgment to MTC on the officers' rounding claim.

## Conclusion

For these detention officers, undergoing the security screening and checking specialized keys and equipment in and out of a centralized inventory-control system are integral and indispensable parts of the principal activities that they are employed to perform: maintaining custody of inmates, searching for contraband, and providing security. As such, those two activities are compensable under the FLSA, and they begin and end the officers' workday. Accordingly, the pre- and postshift activities that occur in between—the preshift briefing, walking to and from post, and the passdown briefings—are part of the officers' continuous workday and are therefore compensable.

35

The officers devote at least eight minutes per shift to conducting these pre- and postshift activities—more than a de minimis amount of time under all the relevant factors. Further, at least two of these activities, the security screening and the passdown briefings, are required by MTC policy, so MTC knows that the officers are engaging in this work. Additionally, because MTC's compensation system appears to routinely round down the time that the officers are working, the officers' rounding claim survives summary judgment. Accordingly, we reverse the district court's order awarding summary judgment to MTC and remand for further proceedings.